**WILLETT v. UNITED STATES et al.**
Civil Action No. 2373.

United States District Court
W. D. Louisiana
Monroe Division.
Sept. 21, 1948.

Jno. H. Benckenstein, Beaumont, Tex., and S. W. Plauche, Jr., of Lake Charles, La., for plaintiff.

Edward Dumbauld, Jno. F. Baecher, Allen Crenshaw, Daniel W. Knowlton, and W. D. McFarlane, all of Washington, D. C., and Malcolm E. Lafargue and Wm. J. Fleniken, both of Shreveport, La., for defendants.

Before LEE, Circuit Judge, and DAWKINS and PORTERIE, District Judges.

DAWKINS, District Judge.

Complainant seeks to set aside an order of the Interstate Commerce Commission, which denied an application under Section 5 of the Interstate Commerce Act, 49 U.S. C.A. § 5, by him and the proposed purchasers, partners in the Tom Hicks Transfer Co., of Monroe, Louisiana (hereafter referred to as Hicks), for authority to transfer certain hauling rights, other than the "stringing" of pipe lines, for the sum of $25,000. Said application, No. MC–F–3396, was filed February 6, 1947.

Plaintiff also asks relief from a similar order in No. MC–F–3399, filed February 10, 1947, in which M. A. Dixon, doing business as Dixon Truck Contractors, of Edmond, Oklahoma (hereafter called Dixon), under the same clause of the Interstate Commerce Act, asked authority to transfer to Willett pipe line stringing rights in other areas, for the sum of $9000.

No opposition having been filed, the applications were consolidated, and after hearing, were submitted April 14, and denied September 8, 1947.

The first application by Willett was covered by certificates issued to him on August 29 and November 22, 1944, in No. MC–704, and authorized:

" * * * transportation, over irregular routes, of (a) machinery, materials, supplies, and equipment, incidental to, or used in, the construction, development, operation, and maintenance of facilities for the discovery, development, and production of natural gas and petroleum, and of the same commodities incidental to, or used in, the construction, operation, repair, servicing, dismantling, and maintenance of natural gas and petroleum, recycling, repressuring, blending or storage plants, and facilities; and (b) pipe, pipe-line material, machinery, and equipment, incidental to, and used in, connection with the construction, repairing, maintenance, and dismantling of pipe lines, including the stringing of pipe, between points in Arkansas, Louisiana, Oklahoma, and Texas."

The Commission described the rights held by Dixon under a certificate issued June 16, 1947, in No. 58900, in the second application, as follows:

" * * * authorizing operations, over irregular routes, in the transportation of (a) machinery, equipment, materials, and supplies used in, or in connection with, the discovery, development, production, refining, manufacture, processing, storage, transmission, and distribution of natural gas and petroleum and their products and byproducts, and (b) machinery, materials, equipment and supplies used in, or in connection with, the construction, operation, repair, servicing, maintenance and dismantling of pipe lines, including the stringing and picking up thereof, between points in Colorado and Wyoming, on the one hand, and, on the other, points in Illinois, Nebraska, South Dakota, and Missouri; and between points in Illinois, Nebraska, South Dakota, Missouri, Oklahoma, Kansas, and Texas."

Succinctly stated, in the first, Willett sought to convey all the rights held by him in the states named, except those under "b," stringing operations; and in the second, Dixon was to convey to Willett only stringing rights, retaining all others under clause "a." In other words, Willett in the first would divest himself of all rights ex-

cept pipe stringing and in the other would acquire those rights only.

Since the pertinent portions of the decision by the Interstate Commerce Commission are not unduly long and present clearly the matters attacked in this case, we quote therefrom as follows:

"As above indicated, under the certificate issued to Willett in No. MC–704, he is authorized to conduct non-radical operations in Arkansas, Louisiana, Oklahoma, and Texas, in the transportation of various oil-field commodities. The commodities authorized to be transported and the service authorized to be performed are divided into three groups, the first two of which generally relate to commodities used in the construction, development, operation, maintenance, servicing, processing, and storage of natural gas and petroleum described under (a) above, and the third group consisting of pipe and commodities used in connection with pipe-line stringing and the dismantling of pipe lines described under (b). By this application the partnership would purchase Willett's authority to transport the commodities referred to in the first two groups, except between points in Arkansas and Louisiana, but including all rights under (a) to operate in Oklahoma and Texas, and between points in those States, on the one hand, and, on the other, points in Arkansas and Louisiana. The partnership's principal operations now consist of the transportation of such commodities and it is not interested in engaging in pipe-line stringing activities. The primary purpose of the proposal herein is to enable it to render a single-line service on the indicated commodities between points in Arkansas and Louisiana, now authorized to be served by it, and points in Oklahoma and Texas. Present interchange arrangements with other carriers authorized to serve points in Oklahoma and Texas have not been satisfactory and have resulted in delays at interchange points as much as 1 day. The partnership has adequate equipment and facilities to conduct the additional operations. Willett desires to dispose of the rights in order to concentrate more fully on his pipe-line stringing operation which comprises approximately 70 per cent of his total business, and in which he would have use for all his present em-

ployees. He utilizes somewhat smaller equipment in this operation than does the partnership. The partnership, already having similar rights to transport the indicated commodities between points in Louisiana, Arkansas, and Mississippi, and proposing to purchase Willett's rights between Oklahoma and Texas, and between points in those States, on the one hand, and points in Arkansas and Louisiana, on the other, could, upon approval and consummation of the transaction, perform a single-line through service between points in Oklahoma and Texas, on the one hand, and, on the other, points in Arkansas, Louisiana, and Mississippi, provided through operations to and from points in Mississippi are via points in either Louisiana or Arkansas.

"As in the case of Willett, Dixon has authority to transport machinery, materials, equipment, and supplies used in connection with the construction of pipe lines, including the stringing and picking-up thereof, but approximately 90 per cent of his business consists of the transportation of machinery, equipment, material, and supplies used in connection with the discovery, development, production, refining, manufacture, processing, and storage of natural gas and petroleum and its byproducts. In other words, only about 10 per cent of his business relates solely to the transportation of pipe-line materials and the stringing of pipes, and he does not maintain the equipment and organization necessary to engage in extensive operations of this character. There would be no adverse effect on present employees of Dixon as a result of the sale to Willett.

"As will be noted, Willett now has and would retain unrestricted authority to transport pipe, pipe-line material, machinery, and equipment used in the construction of pipe lines, including the stringing thereof, between points in Arkansas, Louisiana, Oklahoma, and Texas, and proposes to purchase similar rights from Dixon, among others, between points in Illinois, Nebraska, South Dakota, Missouri, Kansas, Oklahoma, and Texas. As a result of his proposal to purchase the duplicating rights of Dixon in Oklahoma and Texas, he proposes, upon approval and consummation of the transaction, to render a through service between points in Arkansas, Louisiana, Illinois, Ne-

braska, South Dakota, Missouri, Oklahoma, Kansas, and Texas, with crosshauls between points in Arkansas and Louisiana, on the one hand, and, on the other, points in Illinois, Nebraska, South Dakota, Missouri, and Kansas via gateway points either in Texas or Oklahoma. Compare Farmer-Purchase-Crouse, 45 M.C.C. 267.

"The operating rights proposed to be sold, as well as those proposed to be retained by the respective vendors, involve the transportation of related commodities generally used in the natural gas and petroleum industry from, to, and between points in the same general territory. The question is presented whether a division of the operating rights in the manner proposed should be approved, particularly as the vendors would continue to hold authority to transport related commodities in the same general territory covered by the rights sold.

"In the Mercer Extension-Oil Field Commodities, 50 M.C.C. ——, hereinafter called the Mercer case, division 5 found that considerable doubt existed in the industry as to the scope of the authority held by the carriers there involved when that authority covered by the transportation of commodities incidental to and used in the construction, development, operation, and maintenance of facilities for the discovery, development, and production of natural gas and petroleum, particularly was there doubt whether this authority embraced the right to transport pipe-line materials and supplies used in the construction, operation, repair, servicing, stringing, and dismantling of pipe lines, including the stringing and picking-up thereof. The division stated in that report:

" 'The phraseology used in certain of the certificates issued to applicants and other oil field haulers has served to cause doubt and confusion on the part of carriers, shippers and others in the natural gas and petroleum industry as to the exact extent and character of services which the carriers may perform. It is clear that the various services performed by the oil field haulers are of such nature and so closely related as to make it impracticable to segregate them in any of the authority which may be granted herein. The impracticability of a grant of authority for one or a group of carriers to perform a specified service, and for other carriers to perform a different service, has been previously pointed out herein. As interpreted, the authorities now held by applicants under their certificates have fallen short of affording the complete services desired.

" 'It seems not only logical but necessary, in order to remove doubt and confusion on the part of motor carriers, shippers, contractors and others in the natural gas and petroleum industry, to adopt a more uniform commodity description and description of the services authorized, which will be susceptible of easy interpretation by the carriers, shippers or other interested parties, and enable the carriers to provide a complete service to those in the industry. The form of authority herein adopted is designed to bring about such result.

" 'The authority granted will authorize the transportation of machinery, equipment, materials, and supplies used in, incidental to, or in connection with the discovery, development, production and preservation of natural gas and petroleum, and in the construction, operation, maintenance, repair, servicing and dismantling of plants and facilities for the refining, manufacture, processing, storage, transmission and distribution of natural gas and petroleum and their products and by-products, including the stringing of pipe and the picking up of pipe from dismantled pipe lines, except in the two instances hereinafter referred to. * * (In the two instances referred to, at the requests of the applicants in that proceeding, the division restricted the service authorized by excluding authority to string or pick up pipe in connection with "main" pipe lines.)'

"From the report in the Mercer case, it is clear that division 5, in granting certificates to the oil-field carriers there concerned, did so on the basis of providing them with an operating authority under which they could provide a complete transportation service to the oil-field industry. No attempt was made to segregate the various services involved under separate grants, but rather a full and complete description was used, with the clear implication that it should constitute authority to conduct a single service. Any attempt to "cut out" or segregate particular portions

of such rights so as to obtain authority to perform some phase of the oil-field service would tend to destroy the purpose of the grants made in the Mercer case, and would leave certain of the carriers without authority to perform the complete service which it was intended they should have authority to perform. Moreover, if we were to approve the proposed segregation, it would be necessary to condition our approval in such a manner as to make it clear that no "split" of the rights by commodities or services would be permitted. The result of such a condition, in the case of the partnership under the rights purchased, and in the case of Dixon under the rights retained, would be to prevent them from transporting pipe, pipe-line materials, pipe-line machinery, and pipe-line equipment and supplies incidental to and used in connection with the construction, repairing, maintenance, stringing, and dismantling of lateral and gathering pipe lines, as well as main pipe lines, and the stringing and picking up of pipe.

"For the reasons set forth above and in line with the views of division 5 as expressed in the Mercer case, we conclude that carriers holding authority (a) to transport machinery, materials, supplies, and equipment, incidental to, or used in, the construction, development, operation, and maintenance of facilities for the discovery, development, and production of natural gas and petroleum, and (b) to transport pipe, pipe-line materials, machinery, and equipment and supplies, incidental to, or used in, the construction, operation, repair, servicing, dismantling, and maintenance of lateral, gathering, and main pipe lines, including the stringing of pipe lines, should not be permitted to dispose of any portion of those rights and retain the remainder, as herein proposed.

"Under the circumstances, we are of the opinion, and find, that the operating rights of Willett and of Dixon, respectively, proposed to be segregated herein, comprise a single unit of operating authority in each instance, which may not properly be divided.

"We find that the transactions proposed would not be consistent with the public interest, and that the applications, accordingly, should be denied."

The grounds of attack, although stated under ten separate headings, can be reduced to five:

(1) The ruling of the Commission "is not supported by substantial evidence"; (2) the Commission erred in basing its conclusion, in part at least, upon findings of fact in the Mercer case (No. 74595, sub. No. 15) "a case wholly separate and unrelated to the case at bar"; (3) the order of the Commission is contrary to the provisions of 49 U.S.C.A. § 5(2) (a) (i), (b, c); (4) The findings that "the proposed transactions would not be consistent with the public interest was arbitrary, capricious and unreasonable"; and (5) that the "said report and order * * * are without due process of law and violate the 5th Amendment to the Constitution."

Before passing to a consideration of the various contentions thus made, it is well to say that counsel for defendant commission raised the point that plaintiff alone had invoked the jurisdiction of this court, and that neither Hicks nor Dixon had appeared. However, since oral argument, these applicants before the Commission have been permitted to intervene and have joined plaintiff in seeking the relief stated.

Complainant asserts that, since the applications to the Commission were filed under 49 U.S.C.A. § 5(2) (a) (i), which provides: "It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b) * * * for *any carrier,* or two or more carriers jointly, to *purchase,* lease, or contract to operate the *properties, or any part* thereof, of another" (emphasis by counsel), this statute lays down "a guide or yardstick by which the Commission is bound" in 49 U.S.C.A. § 5(2) (c), to-wit:

"In passing upon any proposed transaction under the provisions of this paragraph (2), the Commission *shall give weight* to the following considerations, among others: (1) *The effect of the proposed transaction upon adequate transportation service to the public;* (2) (This is omitted because it is applicable only to railroads); (3) *the total fixed charges resulting from the proposed transactions;* and (4) *the interest of the*

*carrier employees affected.*" (Emphasis by counsel.)

At the hearing, evidence was offered by the applicants only, principally the individual owners of each business, who stated their opinions, that the public interest would be better served by permitting Willett, in the areas described, to conduct pipe stringing operations exclusively, while Hicks and Dixon, in the same areas, did hauling for all other types of oil and gas field operations. Otherwise, the major circumstance claimed to affect adversely public convenience, was that the certificates of authority, in some instances, being restricted to certain states or areas, compelled transfer to other truckers at the borders, of this heavy and cumbersome type of freight, to complete delivery to destination, thus entailing much expense which could be saved, if the first handler were permitted to finish the haul.

On the other points, counsel for complainant invoke "Section 10(e) of the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq." (should be sub-section (e) of Section 1009 of 5 U.S.C.A.), which declares the scope of review by the courts of decisions by executive departments, agencies, etc., including defendant commission.

The principal complaint under this section, as stated above, is that (1) the present record does not contain any substantial evidence to support the Commission's decision, and (2) on the face of the report it is clear that the recited findings of fact are based on evidence introduced in other proceedings in which the complainant and intervenors have had no opportunity to be heard, thus denying them due process.

 Under ordinary rules of evidence, the burden was upon applicants to establish by a fair preponderance their rights to the orders sought. Said section 5(2) (a) (i) of the Interstate Commission Act, quoted above, does declare that it "shall be lawful" with the Commission's approval "provided in subdivision (b)" of the same section and title for one or more carriers "to purchase, lease, or contract to operate the *properties,* or any part thereof, of another"; provided the Commission "finds" the proposal "reasonable" and that it is "within the scope of subparagraph (a) and will be consistent with the public interest." No decision of the courts has been cited, and none, of an all-embracing nature, could define just what is meant by the word "properties." It certainly included the physical or tangible assets, such as trucks, tractors, warehouses, certificates of authority to operate within fixed areas, etc., with respect to commodities, which, in this instance, comprise supplies and equipment for drilling, exploring, handling and transporting oil and gas.

 While the expression "purchase, lease, or contract to operate the properties, or any part thereof" is quite broad, nevertheless points would inevitably be reached, in the attempted division and segregation of such properties for purpose of transfer, where the Commission would be called upon to exercise the power and discretion given it by statute under other sections, to determine whether, in any given instance, a proposal, from experience, was practicable and would operate in the best interests (1) of the public to be served; (2) the persons employed and engaged in the operations; and (3) finally, more efficiently, economically and profitably for those who choose to invest their money in the business. This method of transporting both persons and property has reached a volume and scope comparable to the railroads and other older vehicles of commerce, and it is important that they should not be deterred or curtailed by arbitrary or unnecessary restrictions, for, like the power to tax, if uncontrolled, the power to regulate such instrumentalities could be used to destroy. However, in the matter before us at this time, as stated by the Commission, the conditions are complicated, and there is no well defined line of demarcation as to commodities which will be transported, as between those for general oil and gas field operations, and those used in stringing pipe. It is true that there is some evidence to the point, that, in the latter field the pipe is welded, while in the former it is screwed together, and that certain operators have chosen to confine their activities to pipe stringing alone. But, as the Commission states, thousands of feet of pipe have to be laid or strung in gathering systems and for transporting crude oil to refineries or topping plants in the field, and in conveying natural gas to

gasoline extraction plants, etc. These are facts which are common knowledge in the industry, which the Commission and everyone else may notice; and although in its decision, it refers to the conclusion reached by another division in other cases, as having shown the great difficulties experienced during the war, its conclusion is based primarily upon its own knowledge and experience over the years, that while such segregations were allowed, mainly because of necessity during the recent World War, they proved unworkable, even then, to those engaged in the business. It is our view that the references to the decisions in the other cases have no greater weight or importance than the citation by courts of other cases of a similar nature on the points involved.

In conclusion, it is sufficient to say that, necessarily, there must be a limitation upon the extent to which the separation, segregation, barter and exchange of such rights can be countenanced if good service is to be rendered to the public. In the matters now before this court the Commission has found that the proposals go beyond that limitation, and the showing made by the complainant does not support the charges of arbitrary abuse of discretion given by the statute.

The relief sought will be denied.

Proper decree should be presented.